Good morning, Ms. Bronco, Federal Defenders, on behalf of Ms. Cline. I'll be arguing that Ms. Cline's right to remain silent was violated in many respects in this case, but first I'd like to read a part of the government's closing argument. The government argued in rebuttal towards the end of the rebuttal. Now, what does the defendant say about how she got to Mexico? You heard on the statements that she said nothing. She said she was taken by a friend and wouldn't provide any further information. MR. BRONCO But we don't get to the Doyle question unless we find that first that she properly invoked her right to silence, right? MR. BRONCO Correct, and that's what I'm arguing, that basically this statement shouldn't have been made for two reasons. First, because she invoked at the end of the first interrogation session, and two, that her repeated selective invocations during the second interview session should not have been admitted into evidence and should not have been argued by the government. Turning first to whether or not Ms. Cline invoked her right to remain silent at the end of the interview session, this is air that was playing. Officer Niedermeyer specifically asked, you have nothing further to say then? And again, on the videotape, which Your Honors have had, she clearly shakes her head indicating, no, I have nothing further to say. Officer Niedermeyer even acknowledged this because his next comment during the time that Ms. Cline is shaking her head is, that's the story to us you want to stick with? Okay. Meaning he acknowledged that she had just invoked her right to remain silent. Based on his question, you have nothing further to say. This is classic invocations according to this Court's case law. In Bushyhead, the defendant made the statement, I have nothing to say. I'm going to get the death penalty anyway. That nothing to say was an invocation of the defendant's right to remain silent. Those are nearly identical to Agent Niedermeyer's words, which Ms. Cline confirmed when she nonverbally shook her head communicating she had nothing further to say. So she says that, and then the agent says, all right, I have no further questions, and she asks to leave. But then she comes back and starts talking again in the second videotape. Well, that's where the agents don't scrupulously honor. They make no statements even acknowledging it at the beginning of this second interview session. They just come on and say, we have more questions for us. Are you willing to talk to us? They can't just come out and say that. They have to say, they have to at least make a clarifying question. For example, you know, you indicated earlier you had nothing further to say. We'd like to ask you some more questions. Would you like to do that? They have to in some way acknowledge the fact that she had previously invoked. On the second tape, it says something like, this is Officer Niedermeyer. I'm back on camera. The time's now 2.26 a.m. I've been going over the case. I have a few follow-up questions that I want to ask Ms. Cline in regards to her first story. Ms. Cline, are you still willing to answer my questions? And she says yes. But at the end of the first statement, she had said, do you have anything further to say, and she indicates no. So that's just an example of the agent pretty much bulldozing over the prior invocation, not even acknowledging that it existed. And I think it's particularly important to review the entire videotape from the first session, because I think it's around seven minutes into it, is when the Miranda advisal comes in. And Ms. Cline asked questions regarding can I end this at any time, and Agent Niedermeyer does acknowledge it. And much of that interrogation session is simply Ms. Cline sitting there silently as Agent Niedermeyer keeps basically accusing her of doing the crime, claiming that her story didn't make sense, and she's sitting there silent. So at the end, taking it in context, particularly from the initial statements, her demeanor and her actions of remaining silent through a majority part of it and then confirming at the end, I have nothing you have nothing further to say? No. That is a clear invocation. It doesn't matter what the agents said at the start of it. They did nothing to clarify. It's really expanding the law if we hold that that's sufficient. I mean, if you say at the end of every interview, do you have anything to add, anything more to say, and people say no, and we construe that as an assertion of right, I think we're extending the law quite a bit, don't you think? I don't think so, particularly. I mean, why isn't that just a natural conclusion to the interview, as opposed to if she said, strike the question, I grant you. If she said I have nothing further to say, that's one thing. But if you have anything further to say, she goes, no, no. I think in here there's more because of the second follow-up statement. That's the story you want us, you want to stick with, okay. Meaning the agent's confirming there's no further questions at all. You've indicated you had nothing further to say. And there may be some ambiguity. I mean, maybe it's a better practice to say something like, are there any details you want to go over? No. Obviously that's not an invocation. But if you comment on the person's right, meaning what they have to But even if this wasn't, even if she did not invoke during the first interrogation, unless, does Your Honor want me to go into harmless error on the failure to provide, the failure to honor the invocation, the complete invocation? Anything you want to argue is fine. Well, I'll go on then to the yes. Because during the second interrogation, there were three selective invocations of a right to remain silent. Towards the middle, she's questioned about the individual who Ms. Klein saw in Mexico. Agent Niedermeyer asks, you don't want to say? Ms. Klein responded, no. Agent Niedermeyer immediately acknowledges that he cannot ask any more questions about who she saw in Mexico and moves into another topic. Just, I believe, seconds later, he then starts asking, who took her down to Mexico? Ms. Klein responded, I don't want, I'm not really, I don't want to involve him, you know. A male friend of mine took me down there. I think, right, the I don't want to involve her, him, is selecting the invocation. She's saying she's not going to give up a name. But if there is any ambiguity, it's cleared up because the agents do ask questions. Again, was it a male friend or a female friend? Then she answers, a male. I just really don't feel like this bullshit, you know. I think that's a clear invocation that she's not going to get into the name. So that's the second invocation. If we agree with you that her right to selectively invoke the right to remain silent was violated by the introduction of that, why is it not harmless error? Because I think there was an objection to that. And so we look at harmless error analysis there. Correct. I think there's two reasons, particularly on that question. The agents did not scrupulously honor during that second interrogation that invocation. Why did it make a difference though? Why does it make a difference? Because this is part of the government's case. That because she wouldn't tell who was going down to Mexico, that this implies that she's guilty. I mean, that's exactly what the government argued during closing argument. Now, what does the defendant say about how she got to Mexico? You heard in a statement she said nothing. She was taken by a friend and wouldn't provide any further information. They're directly stating because she wouldn't provide this information, she must be guilty. And that her whole story doesn't make sense. And that's part of it. And this is a close case. Without either of these statements or the government arguing silence from guilt, all you have is Ms. Klein's in a car. She's not the registered owner. There's an individual that's hidden in that compartment that cannot identify Ms. Klein, was placed in that vehicle by another person. The material witness claims that she was in the car for approximately 45 minutes. I believe Ms. Klein's statements was she had been driving the car for about an hour, somewhat consistent. The government's only other evidence was alleged nervousness. This was based on Ms. Klein looking straight ahead and chain smoking. And remember, she's in line pre-primary waiting to get into the inspection booth. It's reasonable that someone that is a smoker would be chain smoking in line rather than smoking as they're driving. And looking straight ahead to the inspection booth, rather side to side about what's going on around them. So much of the government's evidence was put to question. And Ms. Klein was adamant in her denial. She did not know that there was someone in the car. And it's plausible that someone could be duped in this way, that they just purchased the vehicle for $400 and that person set them up by putting an individual in the car. The person that would sell them the vehicle would know exactly where they're going. And again, Ms. Klein's home is an Elka home, so it's a reasonable space from the border. They had ample opportunity to keep another key and get this individual out of the vehicle once it crosses the border. So Ms. Klein has a plausible defense. I mean, trying cases in the Southern District of California, we win cases even in secret compartments. And this is one of those cases that's winnable. And you have to really look at how this is stressed to the jury. Not only do you have the prosecutor's comment, you know, she wouldn't provide any information, but the district court even validated that reason by overruling the objection. The district court says, ladies and gentlemen, you're exclusive judges of the fact. You looked at the vehicle or at the video. It's your recollection that counts. So the district court is allowing the jury to consider the very invocation that is that question here. Basically, this case ties into several other that this court has reversed for violations of Doyle error, meaning, I think, let's just take Velarde Gomez. In there, there was some questions about pre-arrest silence. Basically, that when they told him how much drugs was in the car, he didn't have a reaction. Here you have introducing at least three times questions that Ms. Klein is specifically declining to answer in front of the jury. You also have, say, in Velarde Gomez, you know, the closing argument factor. Here you have the closing argument factor plus the district court judge telling the jury that the government's argument's okay. And I think if you look at the strength of evidence as far as Velarde Gomez in here, it's very similar. If in Velarde Gomez, the individual could be set up by a prostitute that only had about 10 or 15 minutes to give information about where the client's car was and that they could then mechanically change the gas tank and put marijuana into a gas tank, it's entirely conceivable and just as plausible in this case that Ms. Klein thought she was purchasing a car and driving to the border. You know, in both cases, there's some inconsistencies and it may not be compelling evidence, but it's enough to meet or to defeat the government's burden of proving beyond a reasonable doubt that these invocations did not affect the verdict. So unless there's any more questions, I'll save some time for rebuttal. Christopher Alexander May it please the Court, Christopher Alexander for the United States. I am the trial counsel in this case and certainly would like to have made this a much more clear presentation during the closing argument regarding that statement about nothing. But what occurred during that statement is you see the next statement that follows is a comment specifically on the evidence that was offered. Those comments were directed at the evidence, not based on the silence of Ms. Klein. Now, getting back to the specifics regarding the invocation argument by the defense, first, whether there was an invocation at the conclusion of the first interview, this is an issue that was never raised before the district court, is only being raised for the first time on appeal. There is no motion to suppress, I guess, in any of this. The motion to suppress wasn't aimed at this argument that there was a selective or that there was an invocation at the conclusion of the first interview. There was a motion that was filed to suppress, but it wasn't geared at that specific claim that there was an invocation at the end of the first interview. What was it geared at? Well, that's a very good question because when the district court judge asked defense counsel after reviewing the tape whether there was any Miranda issue, the defense counsel said no. Now, what you have here is the defendant being advised of their Miranda rights, waiving those Miranda rights in writing, and then electing to make a statement. Now, at the conclusion, as Judge Wardlaw points out, at the conclusion, the defendant is asked, do you have anything further to add? And the defendant at that point indicates no, I've got nothing further to add. Well, that's not exactly what they said. Well, it's just paraphrasing, Your Honor. It's sort of an important paraphrase in a sense. So you don't have anything more to say? No. Correct. Head shaking. But the next thing that occurs, I think there's some dispute when you look at the tape as to what may have been said, whether the defendant asked may I leave or whether the defendant actually said may I use. And that was the lack. She said may I use, then she said may I leave. Well, may I leave and may I use. Clearly she would, I mean, she asked to leave. Well, it is clear at some point she asked to leave, but the purpose of what she was asking to do in leaving is unclear. Why was she making that statement, may I leave? Well, that statement to me seems totally irrelevant in the sense that he had, the interrogating agent had already said, she said, he said, you don't have anything further to say. She shakes her head no, and he says, all right, I'm done questioning, basically. Correct. And then it's the may I leave or may I use may I leave. Correct. And at the beginning of the next interview, even if there was any ambiguity, the agents clarified that ambiguity regarding the defendant's statement. What the agents asked was a clarifying question. This was not a question designed to elicit incriminating evidence. What the agents were trying to do was to try and find out whether she was willing to continue to make a statement. Isn't that a little bit odd? I mean, I'm really trying to understand why the government so vigorously opposed including both the first video and the second one. It seems to me that it is part of the same. Your best argument is that it is part of the same interview where she said she was willing to answer some questions. And so they say, okay, she's not going to answer any more questions. She goes and apparently sleeps because when she comes back, she looks like she's half asleep on the videotape and really out of it. And then they start right in again. Is this one of the interrogation techniques? And why would you oppose including the whole thing? Well, Your Honor, when you looked at the videotape itself, editing these videotapes is difficult and time consuming. In order to obtain an edit to a videotape, the videotapes themselves are recorded at real time. So any change requires that you make that tape in real time. For an example, if an interview is 45 minutes long, if you want to make one edit, it's going to take greater than 45 minutes to make that edit. The regarding the first thing. I don't understand why you gave me that answer. Well, I just want to provide. The reason you opposed the introduction of the entire tape was because it's just too much trouble and it takes too much time. No, no, no. That's that provides some foundation for why. Now, the edits that would have been necessary in order to introduce the first statement would have been extensive. The defense had already objected to introduction of any evidence regarding the defendant's methamphetamine use. The next issue, which the defense has raised in other cases, is whether the agent's accusations regarding how much time they've spent at the port of entry, whether that information should be admissible. And that was an issue that was never raised. But it would be a question as to whether that would be error. My understanding is that the defense wanted the first videotape in. They asked for it to be in under the rule of completeness. Well, and that's the problem. It's not an issue of completeness. The statements were taken out of context, and the district court found that. The district court had an opportunity to review both the first statement and the second statement and found that there was no instance where the statements were taken out of context. And then even to provide that additional safety valve, the United States intentionally did not object to the defense's inquiry regarding that first statement. All of the information that the defense says that they were unable to present as a result of not playing the tape, they got in. They asked the agent, Neddemeyer, about all the things, the tactics, her denials. All those things were asked. And Officer Neddemeyer provided responses consistent with what the tape showed. The defense was able to ask whatever questions broadly they wanted to in order to establish the things that they say they needed to establish, the arguments that they made in the district court. I guess the original question, though, was why did the government oppose it? They want to introduce this tape. Why not let it in? Well, Your Honor. You didn't object to the testimony later about what happened. Well, and this gets back to the same question. Is it an issue of the rule of completeness? And the district court said no, it's not an issue of the rule of completeness. It still remains hearsay without an exception. And the argument now is that, well, we wanted to introduce it in order to establish demeanor. Well, they were able to introduce that evidence regarding demeanor through the testimony of Officer Neddemeyer. It's not the same, though. It's not the same as seeing the tape. Well, it's – You saved yourself a lot of trouble by just saying, okay, play the tape. In retrospect, maybe that would have been the best course. But looking at whether the district court found that there were two separate interviews, one interview that occurred, and then 45 minutes later a second interview occurred. Now, did the district court view the entire tape? Yes. Okay. And we review that finding for clear error? Well, certainly I think it depends on what the challenge is. If we're looking at whether the tape itself was admissible as far as hearsay, it would be the United States' position that, yes, it is a clear error analysis. Well, hearsay is more of the – I mean, you have to say whether or not the district court correctly found that it was hearsay and if it wasn't offered for the truth but offered only for the demeanor and the course of the interview and not for the truth of her statements. That's a legal question, isn't it? Well, that is a legal question, whether the court correctly construed the hearsay rule. But if you look specifically, what did the district court do? The district court reviewed the tape. And if the defense wanted to put any of this into dispute, certainly they could have done so by making more of a record as to what specifically they wanted to introduce, which they didn't. They wanted the whole tape. Well, but that's just it. If they were permitted to do that, the exception would swallow the rule. A defendant would be able to introduce any videotape statement that they ever gave in its entirety, even if those statements were in multiple interviews. And that would simply just swallow the rule. I'm really troubled by the notion that these were two discrete interviews. They were separated by about 47 minutes. They didn't even give new Miranda warnings. I mean, if they're really two separate interviews, then maybe they should have given new Miranda warnings to her. It seemed to me that it was just part of one entire interview. She stopped talking at one point, and they rousted her up out of bed and started asking her questions again. And she didn't really seem very cooperative at the beginning. She didn't really want to answer the questions. And then she was getting kind of upset in the second interview, saying, I told you, I'm not going to tell you the name. So in a way, on the demeanor part, it seems to me it might have been pretty relevant. Well, at best, if they're looking to introduce evidence of demeanor, it shouldn't include any statements. If all they're seeking to introduce is the demeanor, then they should play the tape without any audio. And you would have agreed to that? Well, it wasn't even raised as an issue. Doesn't demeanor include things like tone and anger and other types of trends? Well, the problem is that if we look at the statements in that context, again, it expands the hearsay rule exception to basically swallow the entire rule. For any videotape or audiotape statement, it would automatically be admissible. A defendant would be able to introduce their statement at any point just by arguing, well, I want to introduce it for demeanor. I don't think the hearsay sky is going to fall on this case. But I don't buy it. But, I mean, seriously, the problem I think you have in this case, if they're really truly separate interviews, then there's an argument to be made that you should have been Mirandized at the start of the second interview. They're completely separate, distinct, unrelated interviews. Well, not necessarily. But there's an argument to be made that a new Miranda warning should have been given. Well, an argument can be made, but as cited in the government's brief, there's no requirement that a defendant be re-advised. And this defendant was being interviewed approximately 45 minutes after the first interview. The Miranda warnings were fresh in her mind. The agents, it was the same two agents that participated in the second interview. And they asked her, are you still willing to answer our questions? And at that point, she knows what her rights are. She's been advised of those rights, and she's signed a written waiver saying that she is electing to make a statement. So that makes it more likely that she was aware, she knew what she was doing, and there's no need to re-advise for Miranda during that second statement. Because she knew what she was doing. And she elected to continue to provide statements. And what's interesting regarding the challenge for the second statement is that at the conclusion of the interview, something that's not cited in the reply brief, the agent's officer asked again, are you speaking with us voluntarily? Are you speaking what? To us voluntarily. And Klein says yes. So you've got bookends in this instance regarding the second interview. She's asked if she wants to, if she's willing to continue answering questions at the beginning of the second interview, and she says yes. And at the conclusion of the interview, she's asked, have you made all of these statements voluntarily? And she again says yes. Well, you know, let's take your hypothetical about the multiple interviews. It strikes me that in some cases that would be highly relevant. Let's say you start off with a very alert defendant on tape who's answering the question in a forthright manner, and there's another interview that's done some hours later, and a third and a fourth. You put in the fifth one, the defendant's tired, haggard, looking mumbling, looking terrible, and the defense wants to argue, look, I mean, this person was interviewed over a series of many hours, and this was the first one, and here's the subsequent demeanor. It seems to me that's relevant. Well, and here's, there is a way in which to introduce those prior interviews. Have the defendant testify. Oh, sure, sure. So that's the way to introduce the demeanor and the interviews, is to have the defendant testify. And in this instance, the defendant chose elected not to testify. You don't have to force the defendant to testify just to introduce a prior consistent statement. If it's a continuous interview, related interview, it needs to be completed. Well, again, at this point, if that's the direction that the court is looking, it is going to swallow the hearsay rule. At this point, there will be no situation in which a defendant, a defendant will be able to provide statements whether they're inculpatory, exculpatory, and all of those statements will become admissible any time that there's a videotape or audio recorded statement. Well, they might not be admissible on other grounds, but the thing is should the government be allowed to just, like, take a break and then call it two unrelated interviews? Well, here we did have a break. It wasn't a situation where the agents were sitting there taking a break. The idea was to conclude the interview. And what the agent said at the beginning of the second interview is that they had some additional questions, things that they wanted to clarify. And that's what they did. They asked those additional questions during the course of the second interview. They also asked a lot of the same questions. And, yes, yes, they did ask some of the same questions. But what they were trying to do was trying to get the specifics that they didn't get in the first interview. What they were trying to do is to get her to confess and to rat out her friends. Well, I think what they were trying to do was trying to get at the truth. What happened in this case? Well, they asked her, and she told them what she wanted to tell them, and she invoked her right to be silent as to the other questions. Well, what she ended up doing was she said regarding the allegations for whether there was selective invocation, during the first question and answer she's asked about, she makes an unintelligible statement in response to the questioning about who she was going to visit in Mexico. You know, I actually don't see how it would have hurt your case to have the first interview in. Well, yes, it doesn't come up that often because usually the government puts in everything. They put in every recording that they have. I gather it was an editing problem that was not a tactical decision. Well, when you look at it from a practical standpoint and from a legal standpoint, these were two separate interviews. The practical point of trying to edit the first interview to make it consistent with what the defense would be requesting as far as what would be admissible and what would not be admissible, at the time of the challenge being made, which was as the jury was being impaneled, would make it impossible to make the edits necessary. No, not at all, really. I mean, all you have to do is hit the mute button when it's going to record. I mean, now you've got great editing equipment that's pretty cheap that you can make those edits, digitize it, and make the edits and all that. But even under the old-fashioned way, you just hit the mute button. That's how we used to do it. My son does it. I was going to say, Mike, I was going to say the same thing. Well, Your Honor, I wish it was that simple. The problem is, of course, the defense wants to exclude certain information. Did they say that? I didn't take that. I thought they wanted the whole thing in. Well, and this was the problem. When the interview was played in its entirety, the defense made a request to redact information regarding the hospital and the use of controlled substances. Regarding the second interview. You just mute that when it goes by. Well, in the course of a 45-minute interview, it's very difficult to do, to try and time it and to make sure that you're going to be able to do that. The other thing is, what is the jury going to think regarding the edits that are being made in front of them? What information is going to be excluded? And then you have the mouth moving with the jury being able to, some of them possibly being able to anticipate what is being said. You've got to take it out. And if you do, really, I just don't see the problem because of the inexpensive modern editing equipment. And I commend that you take that to your supervisors and say, get me some decent editing equipment. If that's the only thing that really is at issue here. But you have the defense raising these issues regarding what should be included and what should not be included right at trial. And that, if anything, makes it difficult to actually go forward with the trial. Can you ask and tell the court and the staff that might be inadmissible that you need to edit it and take a break? Well, I think the onus should be on the defense to raise these issues sooner. I don't disagree with you on that particularly. And I think that you were trying to have a clean trial. I mean, I grant you that. And it's admirable. But maybe you should just give the mute button to the defense counsel and let them be responsible for exciting the stuff they want to. Well, and that's, you know, again, that leads to the problem. You don't have the district court ruling as to what actually is able to come in. You know, once the tape is edited, the district court needs an opportunity to review it to make sure that the edits that were requested by the court are, in fact, have been made. So, again, it provides that additional time period that's necessary in order to ensure that you do have a clean trial. And the bottom line regarding the first and the second interview is the first interview is hearsay without an exception. And the defense would argue that it is geared towards demeanor, but the problem with that is that that's not what they were seeking to introduce it for. What were they? What was your notion of why they were seeking to introduce it? Well, Your Honor, it's really unclear as to what they were doing. They argued in the district court, we're trying to introduce it in order to establish what tactics were used in order to establish my client's demeanor. Right. And they got that information out through Officer Neddemeyer. But you just said that's not why they were trying to introduce it. So what did you mean? It's very likely that what they were trying to do was to inject some error into the trial that ended up, you know, now before Your Honors. Well, they wouldn't get away with that because it would be invited error or something. Right? It's difficult to predict what decisions will be made by the court. What we had here was a situation where you had a videotape, two interviews. The district court found that both interviews were separate. The district court found that there was no issue regarding rule of completeness and that finally regarding the information applying to demeanor. If anything, the videotape would have been cumulative. You know, it's just amazing to me having watched it because to me, looking at the first videotape, my impression is that she's absolutely lying. And I just don't understand. In a way, it's the exact opposite of what you're saying has occurred. By not letting that first videotape come in, now you've created a potential for error. Well, these are the devil's choices that we're faced with during a course of trial. I guess one final issue regarding the selective invocation. One problem regarding the selective invocation is that the defendant keeps on talking. You know, and by way of example, if I am asked, you know, what color is this pin? And I say, I don't want to say. And then my next statement is, it's blue. Have I invoked my right to remain silent? Or have I answered that question? And that's what Klein did during the course of her interviews. She was asked about who is this friend that you traveled to Mexico with? And initially, she does seem to indicate that she doesn't want to answer the question. But then she goes on to answer the question and say, it's a male friend. During the second go-around regarding, you know, who she traveled to Mexico with, she's asked again about, you know, how can we get in touch with this person? And again, she provides some resistance, but then answers that she doesn't know the name of the person that she traveled to Mexico with. She says, I don't know. So she's answering the questions that Klein is arguing now that she selectively invoked her right to remain silent. How can that not be ambiguous? Klein is answering the questions that she says that she has invoked. That's true of all kinds of statements that are made after an invocation. I don't want to talk anymore. I want my lawyer. And then you keep asking questions and they keep answering them. That's the problem. No agent asked another question. No agent asked another question after Klein began making these statements. She's making these statements of her own free will, continuing the conversation. It's not a situation where the agents are asking her questions. And in some instances, the agents are actually saying, okay, raising their hands, trying to stop her from saying anything further. No, no, no. When the agent raised his hand, he was stopping his colleague from asking her further questions because he clearly got that she had invoked her right not to give the name of the people who worked with her. Right, but there was no additional questioning. He told the agent to stop asking questions because he was continuing to do so. But both agents stopped questioning. No agent asked another question at that point. And yet she continues to answer the question. Well, we're doing this from recall, so. Yeah, and that's certainly difficult. But what you have here is that the agents, when they ask a question, she says something that ambiguously could be argued as an invocation, and then she provides the answer without the agents asking another question. How can that not be ambiguous? Any further questions? Thank you, counsel. Thank you. I'll begin by commenting on the last subject, that no agent asked another question after Ms. Klein selectively invoked. Remember, after she made the comment, a male, I just really don't feel like this bullshit, you know, and that's regarding about the person that took her down to Mexico. Again, Agent Neddemeyer stopped questioning on that subject. Again, at the very end of the interview, it's Agent Byrd that starts again, and he says, and it's very important that we talk to him by law, and you don't think we could talk to this person who went into Mexico with. How would we be able to get in touch with this person? So he does start questioning on the very topic for which Ms. Klein said she did not want to discuss and which Agent Neddemeyer recognized that she had previously invoked. And Your Honor is absolutely correct. It's at the end of the interview that Neddemeyer is cutting off Agent Byrd to say, no, let's not go into this topic. She's invoked. So you didn't try the case, but can you tell us, Enlighten us why you wanted the first interview in so much? I've looked at it, and if I was trial counsel, I'd want both in too. I think that I understand Your Honor thinks after watching it that she's lying, but I believe that there, as a trial attorney, I could argue, and argue persuasively that that's a denial, and particularly how hard the agents go after her, and she maintains that she's innocent. Look at her emotion when the. Then you do want it for the truth, and it is an immiscible heresy? No, I don't want it for the truth. I want to show, again, the. Well, I mean, you have to. You're asking me why in general I want it in. And, of course, generally I'd like it for that. In this context, if the government's going to put in the second statements, the second interview session, we absolutely want the first one in, again, to show her change in demeanor and the actions of the agents that somewhat dictate that demeanor. I mean, at the beginning of the tape, she is openly answering questions. Again, I don't care what the answers are to those. It just shows she's willing to talk. As the agents badger her and say, you know, this can't be true. It doesn't happen this way. In my 15 years of experience, this absolutely doesn't happen. That's where she gradually changed. And then, you know, they say, okay, take it away. Forty-five minutes later, her hair is completely different, and she's frustrated with the agents asking her the same questions over again, and that explains the demeanor that she has. And that demeanor was what the government was relying on. They said in opening statements, you're going to see this tape. Look at the demeanor. Judge for yourselves. Well, if they're going to make that statement in opening statements, we should be able to explain that demeanor by what she was subjected to. And this doesn't go to the truth of what she was saying. The government's saying, well, they just wanted the hearsay. Exit of record 91 and 92 clearly go on for a page and a page and a half explaining that, no, it's the conduct of the agents during the first interview session that we want. And to explain how why she may have been more evasive during the second interview is because of what she was subjected to during the first. So there's an absolute record that we were arguing this very theory. That has nothing to do with hearsay. That is not offering it for the truth of the matter of what Ms. Klein was saying. And that means it is de novo reveal because we're interpreting the hearsay rule. This is not hearsay. So did the trial counsel simultaneously ask for the first tape but also ask for some edits and redactions from that tape? I don't believe that there were any redactions asked of the first tape. From my recollection, we're asking it to start at the point the Miranda rights were read. I don't know if they were ever trial counsel was given the choice. You have to have it all, no redactions or. Was the meth conversation before Miranda or after Miranda? The major meth conversation was before Miranda. I believe there was, you haven't taken drugs over the last day or so during the Miranda. I'm not sure if there was any more. It was definitely minimal compared to what's pre-Miranda, their discussion of Ms. Klein's drug use. That meth, you know, if that came in, that would give her a pretty good motivation for wanting to go down to Mexico and maybe get some money for smuggling in someone. Yes, but I mean, one of the problems here is the district court didn't see that we were asking for the demeanor and evidence at all and that we really wanted the conduct of the agents. And we had no objection for whatever the agents said on this. We wanted that to show, hey, she stood tall and wouldn't confess when the agents were saying these things to her before and to show why she's so frustrated with the agents' repeated questions later on. When did the, in the first tape or the second tape, was the subject of the woman being found unconscious discussed? I believe in the first tape. There was once, at the end of the second tape, there was mention of the, oh, the first of the woman found unconscious, that was on the first tape. And again, I think that's powerful evidence of innocence because of her emotional reaction. Yeah, she looked pretty upset. Yeah. Like, oh, my God. You know, not only was there a person in the car, but, you know, they're hurt. So, you know, it's not really the context of, you know, actually what she's saying for the truth of the matter, it's her emotional reaction to that that has probative force. And Your Honor had asked me earlier about the re-advisement at the second interview. And the government is making the argument that this was just a clarifying question. I'd like to read a quote from Lopez Diaz. There is a critical distinction on the one hand, an inquiry for the limited purpose of clarifying whether the defendant is invoking his right to remain silent or has changed his mind regarding an earlier assertion of that right. And on the other hand, questioning aimed at eliciting incriminating statements concerning the very subject on which the defendant has invoked his right. I think the introduction from the second tape shows nothing about a clarifying question and is just we would like to ask you more questions. Thank you, counsel. That can submit. Case history will be submitted for decision. And we will be in recess. Thank you for your arguments.
judges: Canby, Thomas, Wardlaw